**UNITED STATES of America, Plaintiff,**

**v.**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.**

**In re APPLICATION LXVIII OF the INDEPENDENT ADMINISTRATOR.**

No. 88 CIV. 4486 (DNE).

United States District Court, S.D. New York.

April 27, 1992.

Charles M. Carberry, Investigations Officer of Intern. Broth. of Teamsters (Theodore L. Hecht, of counsel), for defendants.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Steven C. Bennett, Asst. U.S. Atty., of counsel), for U.S.

Redmond & Parrinello, New York City (John R. Parrinello, of counsel), for respondent John M. Trivigno.

## MEMORANDUM & ORDER

EDELSTEIN, District Judge

This opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provided for three Court-appointed officials, the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and disciplinary provisions.

Application LXVIII presents for this Court's review the decision of the Independent Administrator regarding a disciplinary charge brought by the Investigations Officer against John M. Trivigno, the President and Business Representative of IBT Local Union 398 in Rochester, New York. The

Independent Administrator found that Trivigno brought reproach upon the IBT by knowingly associating with members of the Rochester Organized Crime Family of La Cosa Nostra. For this violation of the IBT Constitution, the Independent Administrator permanently banished Trivigno from Local 398 and the IBT.

Trivigno argues that he was denied due process and that the decision of the Independent Administrator is arbitrary and capricious. In the alternative, Trivigno argues that the penalty imposed is too severe. This Court finds that Trivigno's arguments are without merit and that the decision of the Independent Administrator is fully supported by the evidence. Accordingly, for the reasons stated below, the decision of the Independent Administrator is affirmed.

## I. BACKGROUND

The Investigations Officer charged that Trivigno brought reproach upon the IBT in violation of Article II, Section 2(a) and Article XIX, Sections 6(b) of the IBT Constitution by knowingly associating with members of the Rochester Organized Crime Family of La Cosa Nostra, including John Fiorino, Richard Marino, Joseph Rossi, Joseph Trieste, Joseph LaDolce, Anthony Oliveri, and Joseph Geniola. Article II, Section 2(a) is the IBT membership oath, which provides in relevant part that every IBT member shall "conduct himself or herself in a manner so as not to bring reproach upon the Union." Article XIX, Section 6(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. One such charge is violating the IBT membership oath. *See* Article XIX, § 6(b)(2).

Pursuant to paragraph F.12(C) of the Consent Decree, the Independent Administrator must decide disciplinary hearings using a "just cause" standard. The Investigations Officer has the burden of establishing just cause by a preponderance of the evidence. December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990).

After conducting a hearing where Trivigno was represented by counsel and receiving post-hearing briefs, the Independent Administrator issued a 29 page decision. The Independent Administrator found that the Investigations Officer satisfied his burden of proving that Trivigno associated with members of the Rochester Family of La Cosa Nostra. (Decision of the Independent Administrator ("Ind.Admin.Dec.") at p. 25).

Specifically, the Independent Administrator found that John Fiorino, Richard Marino, Joseph Rossi, Joseph Trieste, Joseph LaDolce, Anthony Oliveri, and Joseph Geniola are, or were,[1] members of the Rochester Family of La Cosa Nostra. The Independent Administrator based these findings on a number of sources. The Independent Administrator credited the declaration of Special Agent Robert D. Ulmer of the Federal Bureau of Investigations ("FBI"). Agent Ulmer, a supervisory FBI Agent with eighteen-years experience, has specialized in the criminal activities of members and associates of the Buffalo and Rochester Families of La Cosa Nostra. Agent Ulmer's declaration provides information about the existence and activities of the Rochester Family of La Cosa Nostra, and identified Fiorino, Marino, Rossi, Trieste, LaDolce, Oliveri and Geniola as members of the Rochester Crime Family. The Independent Administrator also credited the testimony of Agent John A. Grande of the United States Department of Labor's Office of Labor Racketeering, which corroborated the testimony of Agent Ulmer. Agent Grande, a twenty-year veteran of the Rochester Police Department and formerly head of its intelligence unit, testified that Fiorino, Marino, Rossi, Trieste, LaDolce, Oliveri and Geniola were members of the Rochester Family of La Cosa Nostra.

The testimony of Agents Ulmer and Grande were further corroborated by the testimony of Anthony Oliveri and Angelo Monachino during the trial in *United States v. Russotti, et al.*, 82 Cr. 156 (W.D.N.Y.1984). In the *Russotti* trial, Oli-

---

**1.** Fiorino was murdered in 1981. His murder is allegedly related to a conflict between rival fac-

tions of the Rochester Family of La Cosa Nostra. (Ind.Admin.Dec. at p. 2).

veri admitted that he was a member of the Rochester Family of La Cosa Nostra and testified that Fiorino, prior to his assassination, was a captain in the Family. Monachino, another admitted member of the Rochester Family of La Cosa Nostra and a participant in the Federal Witness Security Program, also testified that Fiorino was a "made" member of the Rochester Family of La Cosa Nostra. Both Oliveri and Monachino testified that Marino, a captain in the Rochester Family of La Cosa Nostra, was present at their induction into the Rochester Crime Family. Oliveri and Monachino also testified that Rossi was a "capo" in the Rochester Crime Family. In addition, Oliveri identified Trieste and LaDolce as members of La Cosa Nostra.

Both the findings of the United States Senate's Permanent Subcommittee on Investigations and certain criminal convictions also corroborate the testimony of Agents Ulmer and Grande. The Permanent Subcommittee on Investigations identified Marino as the Underboss of the Rochester Family of La Cosa Nostra and Rossi as a Captain in the Family. In fact, Marino and Rossi were convicted of participating in a criminal racketeering enterprise at the *Russotti* trial. LaDolce and Geniola were convicted for being members of a criminal racketeering enterprise—identical to the Rochester Family of La Cosa Nostra—in *United States v. Amico*, 87 Cr. 1771 (W.D.N.Y.).

After finding that Fiorino, Marino, Rossi, Trieste, LaDolce, Oliveri, and Geniola were members of the Rochester Family of La Cosa Nostra, the Independent Administrator found that Trivigno had extensive personal contacts with these men for nearly twenty years and that he knew of their organized crime connections. At the *Russotti* trial, Oliveri testified that Trivigno attended several meetings where business of La Cosa Nostra was discussed, including a planned murder attempt in which Trivigno was to drive a motorcycle during the proposed hit.[2] At Trivigno's disciplinary hearing, Agent Grande testified that he personally observed Trivigno associating with Fiorino, Marino, LaDolce, Trieste and Geniola. Agent Grande testified that over several years he saw Trivigno in the company of these members of the Rochester Crime Family at bars, coffee shops, restaurants and street corners. The Independent Administrator found that Rochester Police Department surveillances from 1978–88 corroborated Agent Grande's testimony.

In Trivigno's sworn testimony before his disciplinary hearing, Trivigno admitted that he worked and socialized with Trieste. In an FBI interview with Dominic Tadeo, a member of La Cosa Nostra, Tadeo stated that several members of the Rochester Crime Family—including himself, Trieste, Geniola, and three other made members of the Family—met to discuss mob business. When Tadeo asked if Trivigno and LaDolce were informed of the meeting, Trieste told him that "Trivigno is with 'us,' but did not want to come to this meeting." (Ind.Admin.Dec. at p. 14).

The Independent Administrator found that Trivigno's association with Rochester mobsters spanned nearly two decades.[3] In addition, the Independent Administrator found that the Rochester Family of La Cosa Nostra, including its influence within

---

**2.** Trivigno was named as a defendant in the *Russotti* case, but was acquitted. While Trivigno was acquitted of criminal racketeering charges, the evidence presented at that trial is probative of the Investigations Officer's charge here that Trivigno knowingly associated with members of La Cosa Nostra. It should be noted that even if Trivigno were charged with the same conduct here as in the *Russotti* case, Trivigno's acquittal in that action where the proof was not sufficient to prove his guilt beyond a reasonable doubt would not preclude an internal IBT disciplinary hearing using a preponderance of the evidence standard. *See* February 11, 1992 Memorandum & Order, 787 F.Supp.

345, 351 (S.D.N.Y.1992); *cf. One Lot Emerald Cut Stones and One Ring v. United States*, 409 U.S. 232, 235, 93 S.Ct. 489, 492, 34 L.Ed.2d 438 (1972).

**3.** The Independent Administrator noted that:

It would have been impossible for Trivigno to have associated with any of the members listed in the Investigations Officer's charge other than Trieste, LaDolce and Geniola after 1984, except by visiting the other men in prison, since each of them had been sentenced to lengthy prison terms by then.

(Ind.Admin.Dec. at p. 19 n. 8).

Local 298, has been the subject of extensive media coverage in the Rochester area. Given Trivigno's longstanding relationships with his mob associates, the Independent Administrator found that "it is inconceivable that he was unaware that they were infamous members of [Rochester's] underworld." (Ind.Admin.Dec. at p. 21). The Independent Administrator permanently barred Trivigno from the IBT, stating that "[t]here is only one just reasonable penalty to be imposed when a Union Official ... sees fit to hobnob with mob bosses and underlings—permanent debarment from the very Union he has tainted." (Ind.Admin.Dec. at p. 27 (citation omitted)).

This application followed.

## II. DISCUSSION

Trivigno argues that: (1) he was denied due process; (2) the decision of the Independent Administrator is arbitrary and capricious; and, in the alternative, (3) the penalty imposed is too severe.

In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT*, 905 F.2d 610, 616 (2d Cir.1990), *aff'g* March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990). This Court will overturn the findings of the Independent Administrator when it determines that they are, on the basis of all the evidence, "arbitrary or capricious." August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.1990), *aff'd*, 905 F.2d 610 (2d Cir.1990); *see* February 11, 1992 Memorandum & Order, 787 F.Supp. at 349–50 (S.D.N.Y.1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y.1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 240–41 (S.D.N.Y.1992); November 8, 1991 Memorandum & Order, 948 F.2d 1338, 1341–42 (2nd Cir.1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y. 1991), *aff'd*, 954 F.2d 801 (2d Cir.1992);

October 25, 1991, Order, *slip opinion*, at 4–5 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, *slip opinion*, at 4 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip opinion* at 3–4, 1991 WL 150226 (S.D.N.Y.1991), *aff'd*, No. 91–6200, unpublished slip op., 1992 WL 42697 (956 F.2d 1161[table]) (2d Cir. Jan. 31, 1992); July 18, 1991 Memorandum & Order, *slip opinion* at 3–4, 1991 WL 136030 (S.D.N.Y.1991), *aff'd*, No. 91–6198, unpublished slip op. (2d Cir. Jan. 31, 1992); July 16, 1991 Opinion & Order, *slip opinion*, at 3–4, 1991 WL 136029 (S.D.N.Y. 1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y.1991), *aff'd in part, rev'd in part*, 948 F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y. 1991); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y.1991) *aff'd*, 956 F.2d 1161 (2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.1991), *aff'd*, 940 F.2d 648 (2d Cir. 1991), *cert. denied*, 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1991); December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57 (S.D.N.Y.1990), *aff'd*, 907 F.2d 277 (2d Cir. 1990).

### A. Fifth Amendment Due Process

■ Trivigno argues that he did not receive due process at his disciplinary hearing before the Independent Administrator. This argument makes the improper assumption that the Independent Administrator's conduct at disciplinary proceedings constitutes state action. It is now well settled that the Independent Administrator is not a state actor and his conduct in disciplinary proceedings does not constitute

state action. *United States v. IBT,* 941 F.2d 1292, 1295–96 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); *see United States v. IBT,* 954 F.2d 801, 806–07 (2d Cir.1992). Accordingly, Trivigno's due process claim must fail.

■ Trivigno, however, is entitled to "a fair and impartial hearing" pursuant to Section 12(A)(ii)(c) of the Consent Decree. Trivigno argues that he was denied a fair hearing because the Government's assertion of privilege often denied him access to documents and sources of information that formed the basis of Agent Ulmer's and Agent Grande's opinion testimony.

The Government's right to protect the identity of persons supplying it with information concerning the commission of crimes is the basis of a "well-established testimonial privilege, long familiar to the law of evidence." *McCray v. Illinois,* 386 U.S. 300, 308, 87 S.Ct. 1056, 1061, 18 L.Ed.2d 62 (1967). In this case, representatives of the Government, not the Investigations Officer, asserted the privilege at times in order to protect the identity of confidential informants and to safeguard the integrity of ongoing investigations. The assertion of such a privilege does not render a disciplinary unfair. In this case, the privilege was raised sparingly and only as to a small segment of the information relied on by Agents Ulmer and Grande. Moreover, Trivigno fails to recognize that the Independent Administrator's findings are not based solely upon the opinion testimony of Agent Ulmer and Grande, but upon well corroborated sources of proof. Accordingly, the Government's assertion of privilege did not deprive Trivigno of a fair and impartial hearing.

## B. The Independent Administrator's Findings

■ Trivigno next argues that the Independent Administrator's decision is arbitrary and capricious because he improperly relied on evidence that was not credible. This Court will not substitute its judgment of the credibility of evidence for that of the Independent Administrator unless his de-

termination is arbitrary or capricious. *See* October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1133 (S.D.N.Y.1991). Furthermore, reliable hearsay may be considered by the Independent Administrator in disciplinary proceedings. August 27, 1990 Opinion & Order, 745 F.Supp. 908, 914 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); *see* October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991).

There was ample credible evidence to support the Independent Administrator's finding that Trivigno knowingly associated with seven members of the Rochester Organized Crime Family of La Cosa Nostra: Fiorino, Marino, Rossi, Trieste, LaDolce, Oliveri, and Geniola. After carefully examining the credibility and weight of the evidence, the Independent Administrator found that these individuals were members of the Rochester Crime Family, that Trivigno purposefully associated with these mobsters, and that Trivigno did so knowing of their organized crime ties. The Independent Administrator based these findings on Agent Grande's personal observations, the expert testimony of Agents Ulmer and Grande, the sworn testimony of Oliveri and Monachino, Trivigno's admissions, and surveillances conducted by the Rochester Police Department. A review of the record reveals that the Independent Administrator's findings regarding the credibility and the weight of the evidence was neither arbitrary nor capricious. Indeed, the Independent Administrator's well reasoned decision was fully supported by the record.

## C. The Penalty

■ Trivigno argues in the alternative that his penalty—permanent banishment from the IBT—is too severe. This Court has permanently banished several IBT members who knowingly associated with members of La Cosa Nostra. *See, e.g.,* October 16, 1992 Memorandum & Order, 777 F.Supp. 1130, 1131 (S.D.N.Y.1991); July 18, 1991 Memorandum & Order, 1991 WL 136030 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161 (2d Cir.1992); May 19, 1991 Memoran-

dum & Order, 764 F.Supp. 797 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992). Such a penalty is justified in light of the purpose of the Consent Decree to rid the IBT of the hideous, pervasive, and destructive influence of organized crime. The rank and file must be assured that their leadership is beholden to their interests and not those of La Cosa Nostra. Moreover, the rank and file must be free to raise issues with their leadership without fear of reprisal. Only through banishing IBT officials who knowingly associate with La Cosa Nostra can the IBT maintain its integrity and promote confidence among the rank and file and the public. Accordingly, the Independent Administrator correctly stated that only one punishment suits IBT members, such as Trivigno, who knowingly associate with members of La Cosa Nostra— permanent banishment from the IBT.

### III. CONCLUSION

IT IS HEREBY ORDERED that Trivigno's objections to the Independent Administrator's decision are denied; and

IT IS FURTHER ORDERED that the decision of the Independent Administrator is affirmed in its entirety.

SO ORDERED.