UNITED STATES of America, Plaintiff,

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.**

**In re APPLICATION LXXII OF the INDEPENDENT ADMINISTRATOR.**

**No. 88 CIV. 4486 (DNE).**

United States District Court,
S.D. New York.

May 15, 1992.

Charles M. Carberry, Investigations Officer of the Intern. Broth. of Teamsters, New York City (Theodore L. Hecht, of counsel).

Otto G. Obermaier, U.S. Atty. S.D.N.Y., New York City (Steven C. Bennett, Asst. U.S. Atty., of counsel), for U.S.

Diekemper, Hammond, Shinners, Turcotte and Larrew, P.C., St. Louis, Mo. (Cary Hammond, Jan Bond, Greg A. Campbell, of counsel) for Robert Sansone.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provided for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime

through the election and disciplinary provisions.

Application LXXII presents for this Court's review the decision of the Independent Administrator regarding a disciplinary charge brought by the Investigations Officer against Robert Sansone, the President of IBT Local Union 682 in St. Louis, Missouri. Sansone has been President of Local 682 since 1976. In addition to serving as President of Local 682, Sansone is the President of Joint Council 13, President of the Missouri–Kansas Conference of Teamsters and an International Representative. The Independent Administrator found that Sansone brought reproach upon the IBT by disregarding his fiduciary duty to investigate and act with respect to allegations and evidence that Anthony Parrino, former Local 682 Vice President, was a member of La Cosa Nostra. For this violation of the IBT Constitution, the Independent Administrator barred Sansone from holding office in any IBT-affiliated entity and required that he obtain permission from the Independent Administrator or the Independent Review Board [1] before accepting other work with the IBT. The Independent Administrator also prohibited IBT-affiliated entities from making contributions to employment benefit plans on Sansone's behalf as a result of Sansone's status as an International Representative or due to his position as an officer in Local 682, Joint Council 13, or the Missouri–Kansas Conference of Teamsters. The Independent Administrator did not alienate Sansone's vested benefits, and he stayed imposition of his penalty pending this Court's decision.

Sansone argues that the decision of the Independent Administrator is not supported by substantial evidence and, as a result, is arbitrary and capricious. He also argues that the Independent Administrator penalized him for proffering a defense, which violates the Fifth Amendment's due process clause. Finally, Sansone contends that the Independent Administrator's punishment is arbitrary and capricious. This Court finds that Sansone's arguments are without merit and that the decision of the Independent Administrator is fully supported by the evidence. Accordingly, for the reasons stated below, the decision of the Independent Administrator is affirmed.

## I. BACKGROUND

The Investigations Officer charged that Sansone brought reproach upon the IBT in violation of Article II, Section 2(a) and Article XIX, Sections 6(b)(1) and (2) of the IBT Constitution by failing to investigate whether Anthony Parrino, former Local 682 Vice President, was a member of La Cosa Nostra ("LCN").[2] Article II, Section 2(a) is the IBT membership oath, which provides in relevant part that every IBT member shall "conduct himself or herself in a manner so as not to bring reproach upon the Union." Article XIX, Section 6(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. Two such charges are: (1) violating the IBT Constitution, a Local Union bylaw or other Union rule; and (2) violating the IBT membership oath. *See* Article XIX, §§ 6(b)(1)–(2).

Pursuant to paragraph F.12(C) of the Consent Decree, the Independent Administrator must decide disciplinary hearings using a "just cause" standard. The Investigations Officer has the burden of establishing just cause by a preponderance of the evidence. December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990). After conducting a hearing (the "hearing"), where Sansone was represented by counsel, and receiving post-hearing briefs, the

---

**1.** The Consent Decree provides that "[f]ollowing the certification of the 1991 election results, there shall be established an Independent Review Board. Said Board shall consist of three members, one chosen by the Attorney General of the United States, one chosen by the IBT and a third person chosen by the Attorney General's designee and the IBT's designee." Consent Decree, at ¶ G. The Independent Review Board will perform many of the functions now performed by the Investigations Officer and the Independent Administrator, after the authority granted these court appointed officers terminates. *See* Consent Decree, at ¶¶ G(a)–(n).

**2.** Parrino was an officer of Local 682 for 23 years, and served as Vice President from 1978 until his resignation on March 15, 1991.

Independent Administrator issued a 21–page decision. The Independent Administrator found that the Investigations Officer satisfied his burden of proving that Sansone breached his fiduciary duty by failing to investigate or otherwise act in connection with allegations of Parrino's membership in organized crime. (Decision of the Independent Administrator ("Ind.Admin.Dec.") at p. 17).

*A. Allegations of Parrino's Ties to LCN*

Specifically, the Independent Administrator found that beginning in 1980 and continuing through 1988, Sansone received a great deal of information surrounding Parrino's affiliation with organized crime. Much of this information derived from media coverage of Parrino's ties to LCN.

### 1. Media Coverage from 1980 through 1982

The Independent Administrator found that in 1980, articles began to appear in St. Louis newspapers linking Parrino with the St. Louis crime family of Anthony Giordano, who died in 1980. On December 28, 1980, a St. Louis Post–Dispatch (the "Dispatch") article, which reported that Parrino had met with mafia leaders soon after Giordano's death, stated that Parrino "is often seen in the company of top hoodlums." The Dispatch reported in an article dated April 26, 1981 that Parrino was being groomed to replace then-head of the family, John J. Vitale, after his death. Vitale died in 1982. The article added that "Parrino is seen ... frequently in Vitale's company and that Parrino does many of Vitale's jobs for him." In two more articles, dated June 7, 1982 and June 27, 1982, the Dispatch reported that Parrino had been a candidate for leadership of Giordano's crime family. In yet another article, dated November 5, 1982, which described FBI surveillance of mob activities in the St. Louis area, the Dispatch identified Parrino as both a target of the FBI investigation and "a high ranking member of the St. Louis organized crime family of the late Anthony Giordano."

### 2. Media Coverage from 1986 through 1988

The Independent Administrator found that media coverage of Parrino's ties to LCN intensified in 1986 due to the prosecution of Matthew Trupiano, who had assumed leadership of the Giordano family after the deaths of Giordano and Vitale. In a February 27, 1986 article, which detailed the prosecution of Trupiano for illegal gambling, the Dispatch stated that "Anthony (Nino) Parrino [is] Vice President of Teamster Local 682 and a longtime associate of organized crime figures." On July 11, 1986, another St. Louis newspaper, the Globe Democrat, reported that a tape played at Trupiano's trial identified Parrino as a consigliere, or advisor, to Giordano's crime family. In yet another article concerning the Trupiano prosecution, the Dispatch ran a story on April 3, 1986 based on a sentencing memorandum filed with the court, which linked Parrino to Trupiano and highlighted a conversation among Parrino, Trupiano and Vincenzo "Jimmy" Giammanco.

Finally, on February 19, 1988, the Dispatch reported that three St. Louis labor unions, including Local 682, had contracts with an employer that paid employees less than union scale wages, which enabled the employer to underbid competitors on construction projects. The article alleged that all three unions were "to varying degrees, under the control or influence of organized crime." In contrast to media coverage concerning Parrino, Sansone chose to respond to this article, which implicated Local 682. In a letter to the Dispatch, Sansone denied the story, demanded to know its factual basis, and informed the paper of his investigation into the situation. The Dispatch reported Sansone's objections and reprinted verbatim excerpts of his letter.

### 3. Miscellaneous Allegations

In 1989, Sansone received copies of allegations made by former IBT General President Jackie Presser to the FBI about ties between LCN and Local 682. Presser alleged that Sansone "answered up" to Parrino, who had links to organized crime in St. Louis. At the hearing, Sansone denied that

he answered up to Parrino, and he testified that his attorney, Clyde Craig, advised him that nothing could be done about Presser's allegations.

## B. Sansone's Responses to the Allegations

The Independent Administrator found that Sansone was aware of media coverage concerning Parrino's ties to LCN and that he breached his fiduciary duty by failing to take appropriate action. This does not imply, however, that Sansone failed to respond in any way to the allegations. Rather, the Independent Administrator found that Sansone did not appropriately discharge his obligation to the Union.

### 1. Conduct Between 1982 and 1986: Raising Issue with Parrino and Counsel's Advice

At the hearing, Sansone and Craig testified that in 1981 or 1982, and twice in 1986, Sansone and Local 682's Executive Board discussed Parrino's link to organized crime. Craig also testified that in 1981 or 1982, and again in 1986, he advised Sansone that media reports about Parrino's ties to LCN were unreliable. In addition, Sansone stated that in 1981 or 1982, and again in 1986, he raised the issue of the media allegations with Parrino, who assured Sansone that the reports were false. Sansone asserted that in 1986, he cautioned Parrino about associating with members of organized crime, but he also told Parrino that he could not restrict Parrino's social activities or contacts.

### 2. The 1989 Miller Opinion Letter

The issue of Parrino's ties to LCN arose again in 1989, after Craig returned from a conference of lawyers who represent the IBT and its affiliates. After attending a discussion at the conference about the effect of the Consent Decree on the IBT, Craig advised Sansone to retain outside counsel for further advice concerning Parrino's association with organized crime. Heeding Craig's recommendation, Sansone hired Gerry Miller, an attorney experienced in IBT matters, to analyze and furnish an opinion addressing the issue of Parrino's ties to LCN. The Independent Administra-

tor found that the Miller opinion focused on Sansone's liability for "knowingly associating" with Parrino in light of Parrino's ties to LCN. (Ind.Admin.Dec. at pp. 8–9). As to this issue, the opinion was inconclusive: "[W]e are in no position to provide a legal opinion that Local 682 officials can safely continue on-the-job associations with the local union officer in question." (Ind.Admin.Dec. at p. 15). The Miller opinion did not attempt to investigate the veracity of the allegations surrounding Parrino nor did it address Sansone's fiduciary duty to investigate these allegations.

### 3. The 1990 Meeting with Parrino

The Independent Administrator found that in 1990, Sansone considered requesting Parrino's resignation or firing Parrino. On January 16, 1990, Sansone met with Miller and Parrino to discuss Parrino's possible resignation. At the meeting, Parrino insisted that he had not done anything wrong, and that his contact with reputed members of LCN arose from childhood and adolescent ties, not involvement with organized crime. Sansone then convened privately with Parrino, at which time Parrino stressed his past loyalty to Sansone and expressed his conviction that he would not compel Sansone's resignation in an analogous situation. Sansone testified that ultimately he decided not to request Parrino's resignation because the Miller opinion was inconclusive, the media reports lacked credibility, and because firing him would be unfair.

### 4. Discussion of Parrino with General Membership

Finally, the Independent Administrator found that Sansone discussed Parrino's affiliation with organized crime at several meetings of the general membership of Local 682. Nevertheless, the Independent Administrator also concluded that testimony on this subject was inconsistent. For instance, Sansone originally testified, in a sworn in-person deposition before the Investigations Officer, that he never discussed the issue of Parrino's links to LCN with Local 682's general membership. At the hearing, however, James A. Lysell, a former Local 682 member, testified that

the membership asked Sansone about Parrino's criminal ties at a general membership meeting in 1981 or 1982. At the hearing, Sansone contradicted both his prior testimony and Lysell's statement by claiming that the Parrino issue was discussed at general membership meetings, and that he, not the general membership, initiated discussion of this matter. Finally, Benjamin F. Bond, Local 682's current Secretary–Treasurer, stated that Sansone routinely raised the issue of Parrino's ties to LCN at general membership meetings.

### 5. The Investigations Officer's Charge Against Parrino

On March 13, 1991, the Investigations Officer charged Parrino with membership in LCN while an officer of Local 682, and with "knowingly associating" with members of LCN, including Matthew Trupiano, Anthony Giordano, John Vitale and James Giacamo. Craig informed Sansone of the charge, and also advised him to "take action." (Ind.Admin.Dec. at p. 9). Craig, Sansone and Parrino met on March 15, 1991 to discuss the Investigations Officer's charge, at which time Parrino resigned his office. Parrino resolved the Investigations Officer's charge by signing an agreement on June 11, 1991, in which he neither admitted nor denied guilt. In addition to resigning the Vice Presidency of Local 682, Parrino agreed not to seek or accept any office, membership, or employment, paid or unpaid, in any IBT entities at any time in the future.

### C. Decision of the Independent Administrator

The Independent Administrator found that the Investigations Officer had shown just cause for the charge that Sansone breached his fiduciary duty to the general membership of Local 682 by "deliberately ignoring the evidence and failing to investigate the serious and persistent allegations that Parrino was an LCN member." (Ind.Admin.Dec. at p. 11). Determining that Sansone knew of the allegations about Parrino's ties to LCN, and that Sansone had an affirmative duty to investigate these allegations, the Independent Adminis-

trator found that Sansone's failure to initiate a thorough investigation constituted a breach of fiduciary duty. (Ind.Admin.Dec. at pp. 12–14).

The Independent Administrator also rejected Sansone's arguments, in which he attempted to justify his conduct in this matter. While Sansone averred that he lacked the resources to initiate an investigation, instead placing this responsibility on the Government, the Independent Administrator found that Sansone had the ability to conduct an investigation. (Ind.Admin.Dec. at p. 14). The Independent Administrator also rejected Sansone's argument that his inaction resulted from reliance on the advice of counsel. The Independent Administrator reasoned that Sansone could not rely on the advice of counsel because, while soliciting advice on his personal liability, "he did not solicit, nor did he receive any advice relevant to the issue of his duty to investigate.... Moreover, no expertise, legal or otherwise, is required to understand that a member of organized crime would not belong on the executive board of a union." (Ind.Admin.Dec. at p. 15).

Finally, in summarizing Sansone's conduct in connection with the Parrino matter, the Independent Administrator posited that

in the final analysis, it is clear that Sansone and his advisers turned a blind eye to the alleged corruption in their midst. There was never any genuine acceptance of an affirmative duty to investigate and act on reports of Parrino's ties to organized crime. The persistent discounting of the media reports linking Parrino with the St. Louis La Cosa Nostra is part of the problem. There was never any effort to genuinely consider or critically evaluate any aspect of the many stories that surfaced. Instead, even explicit, detailed statements by verifiable sources, including tapes of recorded conversations were mischaracterized as 'innuendo' or 'insinuation' and the reports were summarily dismissed.... Although the duty called for an investigation, denial, not inquiry, was the standard procedure. The pattern that emerges here is one of attempting to calculate the odds that the

obligation to act could be avoided without consequences.

(Ind.Admin.Dec. at pp. 16–17).

## II. DISCUSSION

Sansone argues that: (1) the decision of the Independent Administrator is not supported by substantial evidence and, as a result, is arbitrary and capricious; (2) the Independent Administrator's punishment rests on an improper basis—Sansone's decision to mount a defense—which constitutes a violation of the Fifth Amendment's due process clause; and (3) the penalty is arbitrary and capricious.

In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT,* 905 F.2d 610, 616 (2d Cir.1990), *aff'g* March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990). This Court will overturn the findings of the Independent Administrator when it determines that they are, on the basis of all the evidence, "arbitrary or capricious." August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.1990), *aff'd,* 905 F.2d 610 (2d Cir.1990); *see* April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 425–26 (S.D.N.Y. 1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345, 349–50 (S.D.N.Y. 1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y.1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 241 (S.D.N.Y.1992); November 8, 1991 Memorandum & Order, *slip opinion,* at 4–5, 1991 WL 243268 (S.D.N.Y. 1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y.1991), *aff'd,* 954 F.2d 801 (2d Cir.1992); October 25, 1991, Order, *slip opinion,* at 4–5 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161 (2d Cir. 1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, *slip opinion,* at 4 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip opinion* at 3–4, 1991 WL 150226 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161 (2d Cir.1992); July 18, 1991 Memorandum & Order, *slip opinion* at 3–4, 1991 WL 136030 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161 (2d Cir.1992); July 16, 1991 Opinion & Order, *slip opinion,* at 3–4, 1991 WL 136029 (S.D.N.Y.1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y.1991), *aff'd in part, rev'd in part,* 948 F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y.1991); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y.1991) *aff'd,* 956 F.2d 1161 (2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.1991), *aff'd,* 940 F.2d 648 (2d Cir.1991), *cert. denied,* 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990); December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57, *aff'd,* 907 F.2d 277 (2d Cir. 1990).

### A. The Independent Administrator's Decision Is Neither Arbitrary nor Capricious

Sansone contends that the Independent Administrator's decision is not based on substantial evidence, and as a result, is arbitrary and capricious. Sansone avers that a perusal of the evidence reveals that he conducted an adequate and reasonable investigation into the Parrino matter. This argument is without merit.

■ "Each [IBT] ... officer is a fiduciary with respect to the Union members." March 6, 1989 Opinion & Order, 708 F.Supp. 1388, 1401 (S.D.N.Y.1989). As a fiduciary, an IBT officer enjoys the trust of the general membership. In exchange for this privilege, each officer is bound to serve the membership's interests. The members of the IBT have an immense stake in a

Union free from the insidious effect of LCN influence.

This is true for numerous reasons. In any given situation, an officer with ties to LCN will be tempted to place the interests of organized crime ahead of the welfare of the general membership. *See* April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 427 (S.D.N.Y.1992) ("The rank and file must be assured that their leadership is beholden to their interests and not those of La Cosa Nostra."). In addition, it is well settled that the presence and influence of organized crime in the IBT brings reproach upon the Union. *See United States v. IBT,* 941 F.2d 1292, 1297 (2d Cir.1991) ("The IA was fully justified in sanctioning [IBT officers for bringing reproach upon the Union by] their knowing association with organized crime."); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 801–02 (S.D.N.Y. 1991) (same), *aff'd,* 956 F.2d 1161, 956 F.2d 1161 (2d Cir.1992); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191 (S.D.N.Y.1990) (same). Moreover, the knowledge that a union office is controlled, either directly or indirectly, by a figure with ties to organized crime is likely to chill the membership's free and active exercise of their Union rights. *See United States v. Local 560, International Brotherhood of Teamsters,* 780 F.2d 267, 286 (3d Cir.1985) ("[T]he history of [organized crime] appointments to union office did cause a substantial portion of Local 560's membership to surrender their right to democratic participation in the affairs of the union."), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); April 27, 1992 Memorandum & Order, 791 F.Supp. at 427 (S.D.N.Y.1992) ("The rank and file must be free to raise issues with their leadership without fear of reprisal."); March 6, 1989 Opinion & Order, 708 F.Supp. 1388, 1398–99 (S.D.N.Y.1989) (climate of intimidation and fear could result in extortion of Union membership's property, in this case, the membership's right to self-determination, guaranteed by the Labor Management Relations Disclosure Act). Quite simply, mafia influence in the IBT is wholly inconsistent with the interests of the rank and file.

Accordingly, every IBT officer must, with unstinting effort and steely resolve, wage an active campaign to purge the Union of the hideous influence of organized crime. *See* November 8, 1991 Memorandum & Order, *slip op.* at p. 8, 1991 WL 243268 (IBT officers "have a duty to investigate and remedy corruption in the union"); March 6, 1989 Opinion & Order, 708 F.Supp. 1388, 1401 (S.D.N.Y.1989) (IBT officers "have a duty to disclose and remedy wrongdoing by the IBT"). While appropriate responses will vary given the unique facts of different situations, a Union officer must in all cases take affirmative steps to eradicate LCN influence. LCN influence is most insidious, and its stranglehold on the IBT greatest, when a member of organized crime holds high Union office. Such a situation provides organized crime with direct and unrestricted access to a position of power within the IBT. Half-hearted responses to any information suggesting mafia influence in the IBT constitute a breach of fiduciary duty. An impotent reaction to allegations that a mob leader holds Union office is nothing less than a gross abdication of responsibility and a blatant betrayal of the membership's trust. *See United States v. Local 295, International Brotherhood of Teamsters,* 784 F.Supp. 15, 19 (E.D.N.Y.1992) (appointment of permanent trustee warranted where "the record shows a smug, almost contemptuous indifference to the presence of organized crime in [IBT] affairs by ... union officials ... and an active effort ... to thwart reform"); April 18, 1991 Opinion & Order, 761 F.Supp. 315, 317–18 (S.D.N.Y. 1991) (failure to take "action with respect to the undeniable fact that [another IBT officer] was controlled by the Kansas City La Cosa Nostra ... amounted to an egregious breach of ... responsibility as an officer of the IBT").

It is beyond reasonable dispute, and Sansone does not contest, that he knew of allegations surrounding Parrino's criminal activity and that he had a duty to investigate the allegations. Sansone asserts, however, that he adequately addressed this matter, and thus, he did not breach his fiduciary duty by failing to in-

vestigate. Given Sansone's conduct, such an argument equates the satisfaction of a fiduciary obligation with passivity and willful ignorance. Upon receiving information that a fellow officer or IBT member has ties to organized crime, an IBT officer will discharge his or her fiduciary duty only by employing whatever means are necessary to verify or refute the information and then implementing appropriate remedial measures. Sansone's response in the Parrino matter fell pathetically short of this standard.

### 1. Sansone's Responses to the Allegations

Confronting an avalanche of media coverage surrounding Parrino's ties to LCN, the Independent Administrator found that Sansone: (1) asked Parrino a few questions about the rumors in 1982 and 1986; (2) sought the advice of his counsel, Craig, who termed the media coverage unreliable; (3) solicited the advice of outside counsel on the issue of his personal liability; (4) met with Parrino in 1990 to discuss the allegations, but failed to take any action; and (5) discussed the Parrino matter with the general membership. This is insufficient.

These responses are united in their guaranteed inability to verify or refute the allegations. Sansone simply did not take any action that could be considered an investigation of or an inquiry into the allegations. Sansone's "questioning" of Parrino consisted of accepting at face value Parrino's denial of the allegations. Sansone remained content with Craig's "layman's opinion that Sansone could not believe what he read in the papers." (Ind.Admin.Dec. at p. 15). Admittedly, Sansone sought the advice of outside counsel; this advice, however, did not relate to the veracity of the allegations or to Sansone's duty to investigate. Instead, counsel informed Sansone on the issue of his personal liability. Sansone's discussion of the allegations with the executive board and general membership was in no way inquisitive.

In sum, Sansone's conduct in this matter, which he claims constitutes an investigation, did not bring him closer to the truth

and ensured that the status quo remained intact. This Court acknowledges that Sansone reacted to the situation. Sansone's fiduciary duty, however, demanded a specific type of reaction: Sansone had to investigate the veracity of the allegations about Parrino's ties to organized crime, and then take appropriate action based upon his findings. His actions here do not constitute such an inquiry. Instead of probing deeply into this matter, he chose the path of least resistance.

Sansone had other options. He had at his disposal an array of possible responses that would have resulted in a true exploration of the allegations. The Independent Administrator noted that Sansone

> could have sought assistance from the authorities; could have obtained the publicly filed Trupiano sentencing memorandum, or even the tape recording to which it refers; could have arranged a polygraph test or an in depth interview of Parrino by a trained professional; could have hired a private investigator; or could have asked his advisors to investigate and develop the facts of the case for his review. The point of all these suggestions is not that any one of them is an essential element of the proper discharge of Sansone's duty to investigate, but rather that reasonable means of investigation were available.

(Ind.Admin.Dec. at p. 14). In addition, Sansone himself could have attempted to verify media reports tying Parrino to LCN or conducted substantive, in-depth questioning of Parrino and others having information about the allegations. Sansone instead opted to remain passive.

In an attempt to justify his lack of action, Sansone challenges his ability to employ effective investigative techniques. This Court rejects the notion that Sansone exhausted his resources in this matter. For instance, it is disingenuous for Sansone to argue that neither he nor his counsel could have attempted to obtain the Trupiano sentencing memorandum, which was a public document. Certainly, Sansone had the resources to arrange for a professional to interview Parrino. Perhaps such an in-

terview would have elicited a more in-depth response from Parrino than Sansone managed to obtain: "I said, 'Tony, are you involved with these people?' And he said, 'No, Bobby, I'm not.'" (Hearing Transcript at p. 268).

Of course, Sansone's failure to employ any one investigative technique is not tantamount to a failure to investigate. Had Sansone chosen to investigate the Parrino matter, no one set of investigative techniques had to be employed. While Sansone's fiduciary duty required some attempt to uncover the truth, had he acted, Sansone enjoyed a fair amount of discretion in choosing appropriate methods. His overall failure, however, to take affirmative steps to confirm the allegations is symptomatic of his consistent and deliberate willingness to remain ignorant. This pattern of passivity reveals that Sansone had no desire to test the veracity of the allegations for fear that they could prove true. By failing to conduct a serious investigation and permitting an allegedly high ranking LCN member to hold Union office, Sansone sanctioned possible mob influence in the IBT and simply ignored the interests of those who trusted him. Such conduct is a gross dereliction of his responsibility to the rank and file and, thus, a clear breach of his fiduciary duty. Sansone's arguments to the contrary are unavailing.

2. Sansone's Attempt to Justify Inaction

█ Confronted with his own inaction in light of the various investigative techniques he could have, but did not, employ, Sansone contends that other considerations, not contained in the Independent Administrator's decision, justified his inaction in this matter, including: (1) the failure of any law enforcement agency to advise Sansone of Parrino's alleged involvement with LCN; (2) the failure of the Government in this case either to designate Parrino as a witness or deponent or to include his name among those provided in response to discovery requests; (3) Parrino's lack of criminal record and satisfactory job performance; (4) the inconclusive nature of the Miller opinion; (5) Sansone's attempt to contact the author of the article in the

Dispatch that linked Local 682 to LCN; (6) the fact that the corruption was not within the Union; and (7) a desire to be fair to Parrino.

It is important to note that these considerations do not support Sansone's claim that he conducted an investigation into the Parrino matter. Instead, they are excuses for inaction. Such excuses do not absolve an IBT officer, such as Sansone, who fails to discharge his or her fiduciary duty to investigate and eradicate LCN influence in the IBT.

For instance, Sansone attempts to blame others for his own failure to act. He seeks to excuse his inaction on the Government's failure to notify him of the Parrino allegations, Miller's inconclusive opinion, and the Dispatch author's refusal to return Sansone's phone calls. These arguments are unavailing.

The Government's failure to alert Sansone to Parrino's connection with organized crime is of no moment. Moreover, once alerted, Sansone cannot justify inaction by the Government's failure to contact Sansone or designate Parrino as a witness or otherwise associate Parrino with this case. Sansone, not the Government, is responsible for inquiring into the veracity of the allegations whether or not the Government decided to initiate action against Parrino. The Independent Administrator correctly stated that "[i]f Sansone's failure to act under the circumstances is accepted as the norm, nothing short of repeated intervention, whether it be by the government or the Court-appointed officers, would suffice to rid the IBT of its organized crime influences." (Ind.Admin.Dec. at p. 18).

Also, the Independent Administrator found that the Miller opinion addressed Sansone's personal liability, not his obligations to investigate the Parrino issue. Because the report was not a factual investigation designed to inform Sansone about Parrino's dual status as a member of organized crime and a Vice President of Local 682, its inconclusiveness on the topics it does address is irrelevant.

In addition, Sansone's attempt to contact the author of the Dispatch article only

highlights his inaction concerning prior media coverage of Parrino. Perhaps Sansone responded to this article alone because this article, in contrast to the others, connected Local 682 with LCN. Sansone's interest in contacting the reporter, then, was not to investigate the Parrino allegations but to defend himself. In attempting to blame others for his own failure to orchestrate an inquiry into the Parrino matter, Sansone refuses to accept responsibility for failing to discharge the duties of his office. Unlike those he terms culpable, however—the Government, Miller, and the Dispatch reporter—Sansone alone enjoyed a fiduciary relationship with the rank and file that compelled an investigation.

Sansone has proffered several other unpersuasive excuses for his failure to investigate the Parrino allegations. Sansone asserts that he had a reduced obligation to investigate because the alleged corruption was not within the Union. This argument is ludicrous. Permitting a leader in the St. Louis mafia to hold high Union office directly implicates the affairs of the IBT. *See, e.g., United States v. IBT,* 905 F.2d 610, 623 (2d Cir.1990) (affirming Independent Administrator's and this Court's finding that embezzling funds of a non-IBT labor union implicated IBT affairs by bringing reproach upon the Union).

Moreover, Sansone argues that his response to the allegations derived from a desire to treat Parrino fairly. While Sansone may have *wanted* to treat Parrino fairly, he had a fiduciary *duty* to the general membership, which required Sansone to take action in response to the allegations involving Parrino. If one pursues one's duty fairly, pursuing one's duty is not unfair. Sansone's primary obligation of fairness belongs to the general membership he purports to represent.

These considerations are not wholly irrelevant. Properly considered, they may have led Sansone to believe that an investigation into the Parrino matter would result in Parrino's exoneration. These considerations, however, do not excuse Sansone's obligation as a fiduciary to investigate serious allegations of mob influence in the IBT. Sansone's oath of office demanded that he undertake the investigation, even if he believed in Parrino's innocence. What he claims to constitute an investigation, however, amounted to no more than a calculated attempt to further the existing situation. Cursory questioning of Parrino, engaging in superficial discussions with the executive board and the general membership, and seeking the advice of counsel on the issue of personal liability does not rise to the level of a meaningful inquiry. An IBT officer obligated to eradicate LCN influence in the IBT does not ignore allegation after allegation that his Vice President is a leader in the St. Louis mafia. The Independent Administrator's finding is supported by substantial evidence and is neither arbitrary nor capricious.

### B. The Penalty

#### 1. Imposition of the Penalty Did Not Violate Due Process

■ Sansone argues that the Independent Administrator based his punishment in part on Sansone's decision to mount a defense. By punishing Sansone for exercising his right to defend the charge, Sansone avers that the Independent Administrator violated the Fifth Amendment's due process clause. This argument makes the improper assumption that the Independent Administrator's conduct at disciplinary proceedings constitutes state action. It is now well settled that the Independent Administrator is not a state actor and his conduct in disciplinary proceedings does not constitute state action. *See United States v. IBT,* 941 F.2d 1292, 1295–96 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); *see United States v. IBT,* 954 F.2d 801, 806–07 (2d Cir.1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1126 (S.D.N.Y.1991). Accordingly, Sansone's due process claim must fail.

■ Sansone's argument also fails on the merits. Sansone bases his due process claim on one sentence in the Independent Administrator's decision: "Sansone's defense of these charges [makes obvious] that he still does not accept, even in princi-

ple, the idea that he was or is obligated to investigate and act against signs of mob influence in his union." (Ind.Admin.Dec. at p. 18). A review of the Independent Administrator's decision finds that Sansone was punished for breaching his fiduciary duty, not for mounting a defense. The Independent Administrator found that Sansone remained passive when confronted with repeated allegations that his Vice President aspired to leadership of an organized crime family. This failure to investigate, stemming from a desire to ignore a possibly unpleasant truth, constitutes a breach of Sansone's fiduciary duty. Accordingly, the Independent Administrator barred Sansone from holding Union office. In imposing such a sanction, the Independent Administrator concluded that "[b]y his failure to act, Sansone has proven he is not fit to serve in any officer or representative positions in the IBT or any of its affiliates." (Ind.Admin.Dec. at p. 18). Sansone's conduct clearly warrants such a penalty.

### 2. The Penalty Was Neither Arbitrary nor Capricious

Sansone argues that in prohibiting him from holding representative or officer positions in the IBT, the Independent Administrator imposed an excessively severe penalty. This Court is aware, as was the Independent Administrator, that "responsible public figures in the St. Louis area, as well as Local 682 members and retirees, think highly of Sansone." (Ind.Admin.Dec. at p. 18). In addition, there has been no suggestion or charge that Sansone has any ties to La Cosa Nostra. Nevertheless, Sansone's failure over the course of a decade to investigate possible corruption in his midst evinces, at best, an Olympian detachment. Instead of orchestrating a meaningful inquiry, he sought information permitting passivity. The IBT will be free from the taint of LCN's influence only when its officers are committed to uncovering and purging the Union's connections to organized crime. IBT officers, as repositories of the membership's trust, owe the rank and file their dedicated efforts toward this goal. Sansone's repeated failure to investigate the Parrino allegations demonstrates that he is unfit to occupy a position of trust within the IBT. Barring Sansone from Union office while allowing him to retain membership in the IBT is an entirely appropriate punishment.

### III. CONCLUSION

IT IS HEREBY ORDERED that Sansone's objections to the Independent Administrator's decision are denied; and

IT IS FURTHER ORDERED that the decision of the Independent Administrator is affirmed in its entirety; and

IT IS FURTHER ORDERED that the stay of penalties imposed by the Independent Administrator is dissolved, effective immediately.

SO ORDERED.