**UNITED STATES of America, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.**

**In re APPLICATION LXXIX of the INDEPENDENT ADMINISTRATOR.**

No. 88 CIV. 4486 (DNE).

United States District Court, S.D. New York.

July 14, 1992.

Charles M. Carberry, Investigations Officer of the Intern. Broth. of. Teamsters, (Celia A. Zahner, of counsel), for Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, et al.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Steven C. Bennett, Asst. U.S. Atty., of counsel), for the U.S.

Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, New York City (John R. Climaco, of counsel), for James L. Coli.

## OPINION AND ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT" or "Union") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provides for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and disciplinary provisions.

Application LXXIX presents for this Court's review the decision of the Independent Administrator regarding a disciplinary charge brought by the Investigations Officer against James L. Coli ("Coli"), the Secretary–Treasurer of IBT Local Union 727 in Chicago, Illinois. The Independent Administrator found that Coli brought reproach upon the IBT by willfully violating his fiduciary duty to investigate and act with respect to allegations and evidence that Joseph Talerico ("Talerico"), a Business Agent of Local 727, was involved in criminal activity and associated with Philip

Ponto ("Ponto"), a member of La Cosa Nostra ("LCN"). For the reasons stated below, this Court affirms the decision of the Independent Administrator in its entirety.

## I. BACKGROUND

The Investigations Officer charged that Coli brought reproach upon the IBT in violation of Article II, Section 2(a) and Article XIX, Sections 6(b)(1) and (2) of the IBT Constitution by failing to investigate and act with respect to allegations and evidence that Talerico was involved in criminal activity and associated with Ponto, a member of LCN. Article II, Section 2(a) is the IBT membership oath, which provides in relevant part that every IBT member shall "conduct himself or herself in a manner so as not to bring reproach upon the Union." Article XIX, Section 6(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. Two such charges are: (1) violating the IBT Constitution, a Local Union bylaw or other Union rule; and (2) violating the IBT membership oath. *See* Article XIX, §§ 6(b)(1)–(2).

 Pursuant to paragraph F.12(C) of the Consent Decree, the Independent Administrator must decide disciplinary hearings using a "just cause" standard. The Investigations Officer has the burden of establishing just cause by a preponderance of the evidence. December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y. 1990). After conducting a hearing, where Coli was represented by counsel, and receiving post-hearing briefs, the Independent Administrator issued a decision finding that the Investigations Officer satisfied his burden of proving that Coli breached his fiduciary duty to the members of Local 727. (Decision of the Independent Administrator ("Ind.Admin.Dec.") at 11).

### A. Coli and Talerico

Coli, a licensed attorney in Illinois and California, has been the Secretary–Treasurer of Local 727 for approximately ten years. As the Secretary–Treasurer of Local 727, Coli is the principle officer of the Local and is in charge of hiring and firing

union employees, as well as granting leaves of absence. Talerico was a Business Agent with Local 727 before Coli became associated with the Local. Talerico held this post until August 27, 1990, when this Court affirmed the Independent Administrator's findings that he brought reproach upon the IBT, in violation of Article II, Section 2(a) and Article XIX, Section 6(b) of the IBT Constitution, by: (1) incurring contempt citations for his refusal to testify before a federal grand jury that investigated the skimming of funds from a Las Vegas casino; and (2) knowingly associating with Ponto. *See* August 27, 1990 Opinion & Order, 745 F.Supp. 908 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992).

### B. Talerico's Criminal Conduct and Association With Ponto

Investigations conducted by the Federal Bureau of Investigations. ("FBI") in the early 1980s revealed that Talerico, while a business agent with Local 727, had information about LCN's involvement in Las Vegas casinos. The FBI documented several meetings between Talerico and Ponto in Las Vegas and obtained surveillance photographs of meetings between the two men.

On February 8, 1982, Talerico was subpoenaed to appear before a special grand jury in the United States District Court for the District of Nevada (the "Grand Jury"). The Grand Jury had been empaneled for the purpose of investigating an alleged LCN "skimming" operation involving the Las Vegas Stardust Hotel and Casino. Talerico was ordered to testify before the Grand Jury under a grant of immunity. On February 9, 1982, Talerico invoked his Fifth Amendment privilege against self-incrimination and refused to testify. Due to his refusal to testify, Talerico was found in civil contempt and was incarcerated from May 25, 1982, until November 18, 1982 when he was released at the expiration of the Grand Jury term.

Once again, on November 1, 1983, Talerico was ordered to testify under a grant of

immunity. Once again, Talerico refused to testify and was held in civil contempt. On February 13, 1984, Talerico was incarcerated for a second time, and remained behind bars until December 7, 1984.

On January 10, 1984, Talerico was indicted for criminal contempt. On August 28, 1984, Talerico entered a plea of nolo contendere. He received a 90–day sentence that ran concurrently with his second incarceration for civil contempt.

## C. Coli's Knowledge of Talerico's Incarceration and Organized Crime Ties

Coli admittedly knew that Talerico served two periods of imprisonment in Nevada. During both periods of incarceration, Talerico asked Coli for a leave of absence from his position at Local 727. Coli granted both requests. Each time Talerico gained released from prison, Coli allowed Talerico to return to work at Local 727. In addition, Coli did not take any action with respect to Talerico between November 30, 1989, the date the Investigations Officer filed charges against Talerico, and July 12, 1990, the date the Independent Administrator issued his decision concerning Talerico.

Coli has testified that all he knew about Talerico's "problem with the Government" was that "he had refused to testify and was therefore being incarcerated." (Investigation Officer's exhibit ("IO Ex.") 2 at p. 41; see IO Ex. 3 at p. 13). Coli never questioned Talerico about the source of this "problem;" nor did Coli endeavor to learn the nature of the Grand Jury investigation or the nature of the questions that Talerico refused to answer.

In addition, Talerico's organized crime ties received extensive media coverage in the Las Vegas area. It appears, however, that only one such newspaper article was published in Chicago: a June 6, 1982, Chicago Tribune piece. The Chicago Tribune reported that the FBI had conducted surveillance of Talerico, who was believed to be the "chief courier" in a casino skimming operation involving members of organized crime. The article reported that the FBI had observed Ponto, a "made" member of

the mafia, and Talerico, an IBT official, exchanging brown paper bags in a parking lot in Nevada. The article also reported another meeting in a parking lot between reputed "mob boss" Joey Aiuppa ("Aiuppa") and Talerico. The article specifically noted that "details of the long FBI surveillance are disclosed in an affidavit filed in the Federal District Court in Las Vegas."

At Coli's disciplinary hearing before the Independent Administrator, Martin J. Burns, an attorney for Local 727, testified that he had discussed the Chicago Tribune article with Coli. In addition, during a deposition in 1988, given in connection with the Government's underlying Civil RICO action against the IBT, *United States v. IBT,* 803 F.Supp. 748 (S.D.N.Y.1992), Coli testified that he "might have" read newspaper reports regarding Talerico's problems with the Government. Coli also testified at this deposition that: "I guess there was some news media revelations concerning [Talerico's problems with the Government]. From time to time people would say is [he] the person that works for you.... I would have said yes, and I don't know anything about it. If that qualifies as discussion, then there was discussion." (IO Ex. 2 at p. 47).

On November 30, 1989, the Investigations Officer charged Talerico with bringing reproach upon the IBT by being held in contempt for refusing to testify before the Las Vegas Grand Jury and for knowingly associating with Ponto, a member of LCN. The Independent Administrator held a hearing on this and other charges on March 20, 1990. At the hearing, documents regarding Talerico's contempt citations were introduced. In addition, documents and photographs were introduced to corroborate the charge that Talerico associated with Ponto. This evidence included the declarations of two FBI agents, FBI surveillance reports, newspaper articles, and photographs of meetings between Ponto and Talerico. (IO Exs. 5–9). After conducting this hearing and receiving post-hearing briefs, the Independent Administrator found that Talerico had brought re-

proach upon the IBT by being held in contempt for refusing to testify before the Grand Jury in Las Vegas and by knowingly associating with Ponto. As a penalty for these violations of the IBT Constitution, the Independent Administrator permanently barred Talerico from the IBT. *See* August 27, 1990 Opinion & Order, 745 F.Supp. 908 (S.D.N.Y.1990), *aff'd*, 941 F.2d 1292 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992).

### D. Advice of Counsel

When Coli was initially informed of Talerico's "problem with the Government," he sought the advice of Edward J. Calihan ("Calihan"), who had been an attorney for Local 727 for approximately twenty-five years. In 1982, Talerico retained Calihan to represent him in connection with the Nevada Grand Jury investigation. After he was retained by Talerico, Calihan informed Coli that he was representing Talerico in a "non-Union" related "personal" matter. (Transcript of Coli's Disciplinary Hearing at p. 75). Later in his representation of Talerico, Calihan informed Coli that Talerico was indicted for criminal contempt.

Calihan advised Coli to grant Talerico a leave of absence during his incarcerations in 1982 and 1984, and not to fire him. At the suggestion of Calihan, Coli sought the advice of two other Local 727 attorneys, Charles Orlove ("Orlove") and Martin Burns ("Burns"). Both Orlove and Burns testified that they were never presented with the underlying allegations regarding Talerico's ties to LCN. Rather, they both testified that Coli told them that Calihan had advised him that Talerico's problems with the Government were not related to the Union. Neither Orlove nor Burns conducted any investigation into the Talerico matter before rendering advice to Coli. Orlove and Burns advised Coli to allow

Talerico to return to work after his release from prison if the cause of his incarceration did not involve the IBT.

### E. The Independent Administrator's Decision

In analyzing the evidence, the Independent Administrator made two inquiries: "(1) whether Coli should have been on notice of the allegations concerning Talerico's association with members of organized crime; and (2) whether he should have investigated these matters." (Ind.Admin.Dec. at 9). He answered both questions in the affirmative. The Independent Administrator then rejected Coli's arguments that: (1) he relied on the advice of counsel; (2) an investigation would have been futile; and (3) his conduct did not fit the pattern of past violations. Accordingly, the Independent Administrator found that Coli brought reproach upon the IBT by violating his fiduciary duty "when he failed to investigate allegations of Talerico's connections to organized crime, and the underlying facts and circumstances which led to Talerico's two terms of imprisonment." *Id.* at 17.

In imposing a penalty, the Independent Administrator considered the many letters received on Coli's behalf from members of Coli's community and the Government. He found, nonetheless, that Coli was not fit to serve as an officer or representative in the IBT or its affiliates. The Independent Administrator barred Coli from holding office in any IBT-affiliated entity and required that he obtain permission before accepting other work with the IBT from the Independent Administrator or, if the Independent Administrator's term had expired, the Independent Review Board.[1] However, the Independent Administrator permanently barred Coli from employment or other work with Local 727. The Independent Administrator also prohibited any IBT-affil-

---

1. · The Consent Decree provides that "[f]ollowing the certification of the 1991 election results, there shall be established an Independent Review Board. Said Board shall consist of three members; one chosen by the Attorney General of the United States, one chosen by the IBT and a third person chosen by the Attorney General's designee and the IBT's designee." Consent Decree, at ¶ G. The Independent Review Board will perform many of the functions now performed by the Investigations Officer and the Independent Administrator, after the authority granted these court appointed officers terminates. *See* Consent Decree, at ¶¶ G(a)–(n).

iated entity from making any contributions to sustain Coli's benefits as a result of his service as an officer of Local 727. The Independent Administrator did not alienate Coli's vested benefits, and he stayed imposition of his penalty pending this Court's review.

## II. DISCUSSION

Coli now argues that: (1) he had no fiduciary duty to investigate Talerico's "problem with the Government;" (2) he was not required to take remedial action with respect to Talerico's non-union activity; (3) there was insufficient evidence to support the Independent Administrator's findings; (4) it was appropriate for him to rely on the advice of counsel; (5) an investigation would have been futile; and (6) his penalty is unduly harsh and unfair.

■ In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT*, 905 F.2d 610, 616 (2d Cir.1990), *aff'g*, March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y. 1990). This Court will overturn the findings of the Independent Administrator when it determines that they are, on the basis of all the evidence, "arbitrary or capricious." *United States v. IBT*, 964 F.2d 1308, 1311 (2d Cir.1992); August 27, 1990 Opinion & Order, 745 F.Supp. 908 (S.D.N.Y. 1990), *aff'd*, 941 F.2d 1292 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.1990), *aff'd*, 905 F.2d 610 (2d Cir. 1990); *see* July 13, 1992 Opinion & Order, 803 F.Supp. 740, 745–746 (S.D.N.Y.1992); July 9, 1992 Opinion & Order, 803 F.Supp. 734, 737–738 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, *slip opinion* at 13–14, 792 F.Supp. 1346, 1352 (S.D.N.Y.1992); April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 425 (S.D.N.Y.1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345, 350 (S.D.N.Y.1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y.1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 241 (S.D.N.Y.1992); November 8, 1991 Memorandum & Order, *slip opinion*, at 4–5, 1991 WL 243268 (S.D.N.Y. 1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y.1991), *aff'd*, 954 F.2d 801 (2d Cir.1992), *cert. denied*, —— U.S. ——, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991, Order, *slip opinion*, at 4–5 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991), *aff'd*, 964 F.2d 1308 (2d Cir.1992); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, *slip opinion*, at 4, 1991 WL 161084 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip opinion* at 3–4, 1991 WL 150226 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 18, 1991 Memorandum & Order, *slip opinion* at 3–4, 1991 WL 136030 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 16, 1991 Opinion & Order, *slip opinion*, at 3–4, 1991 WL 136029 (S.D.N.Y.1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y. 1991), *aff'd in relevant part*, 948 F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y. 1991); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y.1991) *aff'd*, 956 F.2d 1161 (2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.1991), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57, *aff'd*, 907 F.2d 277 (2d Cir.1990).

### A. Duty to Investigate and Take Remedial Action

■ Coli argues that he did not have a fiduciary duty to investigate Talerico's non-job related activities, and that he was not

required to take any remedial measures with respect to Talerico's off-duty, off-premises conduct. In addition, Coli contends that there was insufficient evidence to support the Independent Administrator's findings. Coli's arguments are without merit.

The disciplinary power vested in the Independent Administrator by the Consent Decree "plainly include[s] the power to interpret the disciplinary provisions of the IBT Constitution." *United States v. IBT*, 905 F.2d 610, 619 (2d Cir.1990). Moreover, the Independent Administrator's "comprehensive right to review disciplinary charges ... necessarily includes the final authority to determine what constitutes an offense subject to discipline under the IBT Constitution." *Id.* The Independent Administrator and this Court have determined that failing to investigate and remedy an IBT official's misconduct constitutes a breach of fiduciary duty that brings reproach upon the IBT. *See* July 13, 1992 Opinion & Order, 803 F.Supp. 740, 746 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, *slip opinion*, at 15–18, 792 F.Supp. 1346, 1353–54 (S.D.N.Y.1992); November 8, 1991 Memorandum & Order, *slip opinion*, at 8–9; 1991 WL 243268 (S.D.N.Y.1991); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1126 (S.D.N.Y.1991); April 18, 1991 Opinion & Order, 761 F.Supp. 315, 319–20 (S.D.N.Y.1991).

### 1. Duty to Investigate

■ Every IBT officer has a fiduciary relationship with the Union membership. May 15, 1992 Opinion & Order, 792 F.Supp. at 1353; March 6, 1989, Opinion & Order, 708 F.Supp. 1388, 1401 (S.D.N.Y.1989). As a fiduciary, an IBT officer is a repository of the membership's trust. Tolerating the presence in the IBT of officers who engage in criminal activity and/or have ties to LCN violates the trust of the membership and

constitutes a breach of fiduciary duty.[2] Accordingly, "every IBT officer must, with unstinting effort and steely resolve, wage an active campaign to purge the Union" of corruption. May 15, 1992 Opinion & Order, *slip opinion*, at 16.

### 2. Duty to Take Remedial Action

■ IBT officers cannot avoid responsibility by shutting their eyes to allegations that their fellow IBT members engage in criminal activity or associate with factions of organized crime. May 15, 1992 Opinion & Order, *slip opinion*, at 18–21, 26–27. While appropriate responses to such information will vary given the unique facts of different situations, an IBT officer must in all cases take affirmative steps to eradicate the taint of Union officials who engage in criminal activity or associate with members of organized crime. *Id.* at 17; *see United States v. Local 295, Int'l Brotherhood of Teamsters*, 784 F.Supp. 15, 19 (E.D.N.Y. 1992); April 18, 1991 Opinion & Order, 761 F.Supp. at 317–18. When an IBT officer knows, or should know, that a fellow officer or IBT member engaged in criminal activity and/or has ties to organized crime, "an IBT officer will discharge his or her fiduciary duty only by employing whatever means are necessary to verify or refute the information and then implementing appropriate remedial measures." *See* May 15, 1992 Opinion & Order, *slip opinion*, at 18. While Coli argues that Talerico's criminal activity and association with LCN were not related to the IBT, this Court has held that an IBT official's criminal activity and association with LCN "directly implicates the affairs of the IBT." *Id.* at 23; *see, e.g., United States v. IBT*, 905 F.2d at 623 (affirming finding that embezzling funds of a non-IBT labor union implicated IBT affairs and brought reproach upon the IBT).

Accordingly, Coli had a fiduciary duty both to investigate and take remedial action with respect to all information and

**2.** In this regard, it is important to note that upon the IBT's motion to dismiss the Government's Complaint in this action, this Court held that failing to act—investigate and remedy corruption in the Union—when there is a fiduciary duty to do so, may constitute aiding and abet-

ting the extortion of IBT members' rights to self-determination under the LMRDA. March 6, 1989 Opinion & Order, 708 F.Supp. 1388, 1401 (S.D.N.Y.1989). Moreover, this Court found that such extortion constituted an act of racketeering under the RICO statute. *Id.*

allegations of criminal activity and LCN associations of Local 727 officials.

### 3. Coli's Conduct Regarding Talerico

■ Coli knew that Talerico was twice imprisoned on federal charges of civil and criminal contempt in Las Vegas. Once Coli knew, or had reason to know, of Talerico's incarceration, Coli had a fiduciary duty to inquire into the events and circumstances surrounding Talerico's incarceration. Had Coli done so, he would have discovered that Talerico transported skimmed funds for LCN and had ties to organized crime.

Coli, however, did no investigation whatsoever into the facts and circumstances that lead to these two terms of imprisonment. Coli did not even take the obvious and simple step of questioning Talerico about his criminal conduct in Las Vegas. When Coli was asked during his 1988 deposition whether Talerico elaborated on his problem with the Government, Coli responded, "I didn't ask him to." (IO Ex. 2 at 41). Moreover, Coli made no effort to obtain public court records in Las Vegas concerning Talerico, which included a November 25, 1981 sworn affidavit by Michael J. Glass, a Special Agent of the FBI. This affidavit detailed Talerico's meetings with Ponto in which envelopes were exchanged, described the clandestine manner in which Talerico travelled to Las Vegas, identified the false names used by Talerico during his travels, and detailed Talerico's actions as a courier of skimmed money. (IO Ex. 13). In addition, Coli knew there were articles discussing Talerico's "problem with the Government." (IO Ex. 2 at p. 47). Indeed, a number of articles in Las Vegas newspapers and the June 6, 1982, Chicago Tribune article discussed Talerico's involvement in LCN's skimming operation from Las Vegas casinos and referred to public documents that corroborated these allegations. Moreover, Coli, an attorney, chose not to commission any investigation into the nature of Talerico's illegal activities and prohibited associations.

At a minimum, Coli should have known of Talerico's criminal activities and of his association with LCN. Rather than conduct an inquiry, however, Coli chose to sanction Talerico's conduct by granting Talerico two leaves of absence during his periods of incarceration and then allowing him to resume his position at Local 727 each time he was released from prison.

In light of Coli's admitted total failure to act when Coli's fiduciary duty required him to do so, the Independent Administrator's finding that Coli breached his fiduciary duty and thereby brought reproach upon the IBT is supported by the evidence and is neither arbitrary nor capricious. The IBT will only be free from the taint of corruption when its officers are committed to investigating and acting with respect to IBT members who are involved in criminal activity or have ties to organized crime. *See* May 15, 1992 Opinion & Order, *slip opinion* at 26–27. IBT officers who fail to exercise such vigilance—and thereby allow IBT members who engage in criminal activity and associate with organized crime to remain in the Union—breach their fiduciary duty to the rank and file and bring reproach upon the IBT.

### B. Excuses for Inaction

Coli offers two excuses for his inaction. First, he argues that he relied on the advice of counsel. Second, he argues that an investigation would have been futile. These arguments are without merit.

### 1. Reliance On Advice of Counsel

■ Coli raised the "advice of counsel" defense before the Independent Administrator, who rejected it. The Independent Administrator found that Coli should not have been satisfied with Calihan's meager disclosure concerning Talerico's "problem with the Government." (Ind.Admin. at 13). Far from insulating Coli from responsibility, Calihan's disclosure was so minimal that it cried out for further investigation. Once alerted to Talerico's problem, Coli was obligated to take action. Calihan's advise was also deficient because he had an obvious conflict of interest in representing both Talerico and Local 272. As an attorney, Coli should have been keenly aware of this conflict.

The Independent Administrator also rejected Coli's alleged reliance on Burns' and Orlove's advice because their opinions were premised on Calihan's assertions that Talerico's problem did not involve the IBT. However, as the The Independent Administrator stated, "any time [an IBT] officer is involved in activity such as that Talerico was involved with, the [IBT] is necessarily involved and, at a minimum, an investigation is required." *Id.* at 14. In addition, the Independent Administrator rejected Coli's alleged reliance on Burns' and Orlove's advice because Coli knew that they did not investigate the circumstances surrounding Talerico's imprisonment or his ties to organized crime.

The Independent Administrator's rejection of Coli's "advice of counsel" defense was neither arbitrary nor capricious. When the principal officer of a Local—who is charged with the fiduciary duty to investigate and remedy wrongdoing—knows that a fellow union official has been twice imprisoned while holding union office, both common sense and fiduciary duty dictate an inquiry into the circumstances surrounding the incarceration. It is disingenuous for Coli, an attorney, to argue that he relied on the advice of counsel.

### 2. The "Futility" of an Investigation

■ Coli argued before the Independent Administrator that any attempt to investigate Talerico prior to 1990 would have been futile. The Independent Administrator rejected this argument. In doing so, the Independent Administrator pointed to the June 6, 1982 Chicago Tribune article, which stated that FBI agents had observed meetings between Talerico and Ponto and one meeting between Talerico and Aiuppa. The Chicago Tribune article disclosed that FBI affidavits regarding the surveillance of Talerico were available to the public. These affidavits were available to the public as early as 1982. Coli could have retrieved these records. In addition, he could have easily obtained accounts of Talerico's

activities from Nevada newspapers. Far from being futile, even a cursory investigation would have disclosed the circumstances surrounding Talerico's criminal contempt and his association with organized crime. It was neither arbitrary nor capricious for the Independent Administrator to reject this defense.[3]

### C. The Penalty

■ Coli argues that the penalty imposed by the Independent Administrator was unduly harsh and unfair. In imposing a penalty, the Independent Administrator considered the many letters received on Coli's behalf from members of Coli's community and the Government. The Independent Administrator, however, found that by failing to act, Coli proved that "he is not fit to serve in any officer or representative positions in the IBT or any of its affiliates." (Ind.Admin. at 18). Given Coli's conduct and acknowledging the letters submitted on Coli's behalf, the penalty imposed by the Independent Administrator was neither arbitrary nor capricious.

### III. CONCLUSION

IT IS HEREBY ORDERED that Coli's objections to the Independent Administrator's decision are denied; and

IT IS FURTHER ORDERED that the decision of the Independent Administrator is affirmed in its entirety; and

IT IS FURTHER ORDERED that the stay of penalties imposed by the Independent Administrator is dissolved, effective immediately.

SO ORDERED.

---

**3.** This opinion attempts to address every significant argument made by Coli. To the extent that this opinion does not address every argument, this Court has considered them and finds them meritless.