UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION XCIX OF the INDEPENDENT ADMINISTRATOR.

No. 88 Civ. 4486 (DNE).

United States District Court, S.D. New York.

March 5, 1993.

Charles M. Carberry, Investigations Officer of the Intern. Broth. of Teamsters (Jeffrey S. Tolk, of counsel), Roger S. Hayes, U.S. Atty. for the S.D.N.Y. (Christine H. Chung, Asst. U.S. Atty., of counsel), for U.S.

Baptiste & Wilder, P.C., Washington, DC (Robert M. Baptiste, of counsel), for respondents.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement of an action commenced by plaintiff United States of America (the "Government") against defendants International Brotherhood of Teamsters (the "IBT" or the "Union") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provides for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral process that culminated in the 1991 election for International Officers. The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and disciplinary provisions.

Application XCIX presents for this Court's review the decision of the Independent Administrator finding that the Investigations Officer had proven charges filed against John T. Burke, Jr., President of IBT Local 868 and 917; Harold Wolchok, Secretary–Treasurer of IBT Local 868 and 917; Mario Abrego, Vice President of IBT Local 917 and Trustee of IBT Local 868; Robert Ottman,

340

Trustee of IBT Local 917 and business agent of IBT Local 868; Langston McKay, Recording Secretary of IBT Local 917 and business agent for Local 868; Walter Cahill, Trustee of IBT Local 868 and 917; Saul Brechner, Vice President of IBT Local 868; and, Walter Simmons, Trustee of Local 917 and business agent for Local 868.[1]

## BACKGROUND

Respondents are members or former members of the Executive Boards of IBT Locals 868 and 917. Local 917 is based in New York City and represents gasoline station and parking garage attendants, automobile mechanics, cleaning service personnel and staff employees of a charitable organization, the United Jewish Appeal. Local 868 is headquartered in Local 917's New York offices, and was organized by Local 917 officers to represent automobile dealership employees and liquor truck drivers.

The Investigations Officer alleged that Respondents breached their fiduciary duties to the members of IBT Locals 868 and 917 in violation of Article II, Section 2(a) and Article XIX, Section 6(b) of the IBT Constitution[2] by executing a scheme, under the guise of an associate membership program, to enrich themselves (the "Associate Membership Program Charge"). Article II, Section 2(a) is the IBT membership oath, which provides in relevant part that every IBT member shall "conduct himself or herself in a manner so as not to bring reproach upon the Union." Article XIX, Section 6(b) is a non-exhaustive list of disciplinary charges that may be filed against IBT members. One such charge is violating the IBT membership oath. See Article XIX, § 6(b)(2).

In addition to these charges, the Investigations Officer filed two additional charges against Messrs. Burke and Wolchok. First,

Mr. Burke and Mr. Wolchok were charged with breaching their fiduciary duties to the Union and violating 29 U.S.C. § 503(a)[3] in connection with an illegal loan to Mr. Burke from Local 917 (the "Loan Charge"). Second, Mr. Burke and Mr. Wolchok were charged with breaching their fiduciary duties to the Union and violating Article XIX, Section 6(b)(3) of the IBT Constitution, by embezzling more than $6,000 of Local 917's funds via a retroactive increase of Mr. Burke's salary (the "Embezzlement Charge"). Finally, Mr. Wolchok was charged with bringing reproach upon the IBT in violation of Article II, Section 2(a) and Article XIX, Section 6(b)[4] of the IBT Constitution by submitting false and dishonest information in connection with an IBT audit of Local 917's books (the "Audit Charge").

Pursuant to paragraph F.12(C) of the Consent Decree, the Independent Administrator must decide disciplinary hearings using a "just cause" standard. The Investigations Officer has the burden of establishing just cause by a preponderance of the evidence. December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990). After conducting a hearing at which Respondents were represented by counsel, and receiving pre- and post-hearing briefs, the Independent Administrator issued a thirty-page decision. The Independent Administrator found that the Investigations Officer had sustained his burden of proving the charges filed against Respondents.

As a penalty for this conduct, the Independent Administrator suspended Respondents from the IBT, and barred them from receiving compensation from any IBT-affiliated source, for a period of two years. In addition, the Independent Administrator disqualified Respondents from holding any IBT-affil-

---

1. John T. Burke, Jr., Harold Wolchok, Mario Abrego, Robert Ottman, Langston McKay, Walter Cahill, Saul Brechner, and Walter Simmons are hereinafter referred to collectively as "Respondents."

2. All references herein are to the 1986 IBT Constitution under which Respondents were charged.

3. Title 29, United States Code, Section 503(a) prohibits loans from labor organizations to officers or employees of the organization that are in excess of $2,000.

4. Article X, Section 10, of the IBT Constitution authorizes the General Secretary–Treasurer of the IBT to audit the books of Local Unions. Interference with such an audit is a basis for discipline under Article XIX.

iated Union positions, such as Executive Board or Trustee positions, for two additional years following the expiration of their suspension from the IBT. Furthermore, the Independent Administrator exercised his authority to impose sanctions upon Respondents' employee benefits. *See* December 28, 1990 Memorandum & Order, 753 F.Supp. 1181 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991). The Independent Administrator prohibited the IBT or any affiliate from contributing funds to sustain benefits on behalf of Respondents during their period of suspension. Finally, the Independent Administrator ordered that the IBT and IBT-affiliated entities refrain from contributing to legal fees incurred by Respondents in connection with the instant disciplinary action. *See United States v. Local 1804–1,* 732 F.Supp. 434, 437 (S.D.N.Y.1990). The Independent Administrator stayed his decision pending this Court's review.

Respondents appeal the decision of the Independent Administrator. This Court finds that the Independent Administrator's determination that the Investigations Officer had proven the charges against Respondents is fully supported by the evidence, and that Respondents' arguments to the contrary are devoid of merit. Furthermore, the Court finds that the penalty imposed by the Independent Administrator on Mr. Burke and Mr. Wolchok is fully supported by the evidence. However, for the reasons discussed below, *see infra* at 347–348, the penalty imposed on Messrs. Abrego, Ottman, McKay, Cahill, Brechner and Simmons is vacated and remanded to the Independent Administrator for reconsideration. Accordingly, the opinion of the Independent Administrator is affirmed in part and vacated in part.

## DISCUSSION

█ In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT,* 905 F.2d 610, 616 (2d Cir. 1990), *aff'g* March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990). This Court will overturn the findings of the Independent

Administrator when it determines that they are, on the basis of all the evidence, "arbitrary or capricious." *United States v. IBT,* 964 F.2d 1308, 1311 (2d Cir.1992); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.1990), *aff'd,* 905 F.2d 610 (2d Cir.1990); *see* July 14, 1992 Opinion & Order, 803 F.Supp. 748, 754 (S.D.N.Y.1992); July 13, 1992 Opinion & Order, 803 F.Supp. 740, 745–46 (S.D.N.Y.1992); July 9, 1992 Opinion & Order, 803 F.Supp. 734, 737–38 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1352 (S.D.N.Y.1992); April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 425 (S.D.N.Y. 1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345, 350 (S.D.N.Y.1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y.1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 241 (S.D.N.Y.1992); November 8, 1991 Memorandum & Order, 948 F.2d 1338, 1341–42 (S.D.N.Y.1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y. 1991), *aff'd,* 954 F.2d 801 (2d Cir.1992), *cert. denied,* —— U.S. ——, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991, Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991), *aff'd,* 964 F.2d 1308 (2d Cir.1992); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161, *unpublished slip op.* (2d Cir.1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, *slip op.,* at 4, 1991 WL 161084 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip op.,* at 3–4, 1991 WL 150226 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161, *unpublished slip op.* (2d Cir.1992); July 18, 1991 Memorandum & Order, *slip op.,* at 3–4, 1991 WL 136030 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161, *unpublished slip op.* (2d Cir.1992); July 16, 1991 Opinion & Order, *slip op.,* at 3–4, 1991 WL 136029 (S.D.N.Y.1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y.1991), *aff'd in relevant part,* 948

F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y.1991); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y. 1991) *aff'd,* 956 F.2d 1161 *unpublished slip op.* (2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.), *aff'd,* 940 F.2d 648 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57, *aff'd,* 907 F.2d 277 (2d Cir.1990).

## I. *The Associate Membership Program Charge*

The Independent Administrator found that each of the Respondents breached their fiduciary duties to the general membership and brought reproach upon the IBT by engaging in transactions adverse to the interests of the Union rank and file. The members of both Local 917 and Local 868 participate in the Local 917 Health & Welfare Fund (the "Fund") pursuant to their collective bargaining agreements. In 1986, Mr. Burke and Mr. Wolchok became aware that several employers of Union members were interested in obtaining low-cost health insurance from the Union for employees who were not members of collective bargaining units. Thereafter, Respondents developed an "associate membership" program (the "Program") that allowed companies that were parties to collective bargaining agreements with Local 917 or Local 868 to obtain coverage for non-Union employees through the Fund. Associate members were not required to join the Union in order to enroll in the Program and indeed many associate members were ineligible for Union membership.

In administering the associate membership program, Respondents dealt with employers of Local members rather than with persons to be covered by the Fund. Pursuant to the terms of the Program, Respondents negotiated with employers and required, as a condition to participation in the Program, that all eligible non-Union personnel participate. Employers were charged with the task of recruiting associate members. Employers then paid a service fee to the Locals based on the number of associate members that they recruited. The service fees for associate membership ranged from $10 to $12 per member.

The Independent Administrator found that Respondents "failed to rebut the central conclusion urged by the Investigations Officer— that the associate membership program was conceived solely as a means to enrich the individual Respondents." *Ind.Admin.Dec.* at 17. Finding that Respondents did not use funds generated by the associate membership program to benefit the Locals, *see id.* at 18, the Independent Administrator determined that

> the Respondents abused their trusted positions as Union officers to further a scheme which was designed with only one purpose in mind—to further their own individual financial interest. As such, the Respondents brought 'reproach upon the Union.' IBT Constitution (1986), Article II, Sec. 2(a); Article XIX, Sec. 6.

*Id.*

Respondents dispute the Independent Administrator's findings, arguing that Union members benefitted from the Program because the Program helped publicize the benefits of Union membership, increased Union revenues, and increased income to the Fund itself. *See Respondents' Objections to Application XCIX of the Independent Administrator* ("Respondents' Objections"), at 8, 10. Respondents deny that the Program was designed for their personal enrichment, and attribute the Program's genesis to a February 1985 AFL–CIO report discussing the decline of organized labor in the United States. *See id.* at 5–9. Finally, Respondents argue that the terms of the Program were reviewed and approved by Mr. Irving Bush, counsel to the Locals. *See id.* at 11, 15.

■ Respondents' objections to the decision of the Independent Administrator are without merit. The evidence clearly supports the Independent Administrator's finding that Respondents conceived and implemented the associate membership program for their personal economic gain. In so do-

ing, Respondents breached their fiduciary duties to the members of Local 868 and Local 917 and brought reproach upon the IBT. While the Independent Administrator found that the Program may have offered some incidental benefit to the Locals, the evidence clearly shows that virtually all of the funds generated by this Program were funnelled directly to Respondents rather than to the coffers of Locals 868 and 917.

Evidence abounds of such an improper purpose and deleterious effect. The records of Locals 868 and 917 detail a significant correlation between the receipt of service fees and Respondents' salary levels: Respondents' salaries increased in almost direct proportion to the service fees collected as a result of the Program. For example, in 1987, Locals 868 and 917 collected $127,316.00 more in service fees than they had in 1986. In 1987 Respondents paid themselves $128,769.00 more in salaries than they had received in 1986. Moreover, while Mr. Burke received a total salary of $77,420.00 from the Locals in 1985; in 1987, the first full year in which service fees were collected, Mr. Burke's total salary increased to $115,959.00.

The record further shows that Respondents' efforts on behalf of the associate membership program were motivated by the opportunity for personal gain. For example, it was adduced in the course of hearings before the Independent Administrator that at a June 29, 1988 meeting of the Local 868 Executive Board, Mr. Wolchok argued that, unless associate membership fees continued to increase, Respondents would be unable to get paid the salaries that they wanted. Specifically, Mr. Wolchok stated in reference to Respondents' salaries that, "[a]s always, the only way we can resolve this issue is to increase our organizing efforts both in the traditional mechanism and in associate groups." *See Minutes of Local 868 Executive Board, June 29, 1988.* Although Respondents deny that they actively solicited new associate membership accounts, *see Respondents' Objections* at 14, the evidence adduced before the Independent Administrator refutes this denial. *See, e.g., Minutes of Local 868 Executive Board, November 16,* *1988* (stating that "all agents should redouble their efforts to bring in new accounts").

Respondents' thus breached their fiduciary duties to the Locals. An insidious by-product of the Program was that it made Respondents financially dependent on employers' discretionary continuance with the Program. Employers that participated in the Program were, by the terms of the Program, free to terminate participation at any time. In order for Respondents to maintain their artificially high salaries, they needed to ensure that the Program continued to generate fees. This created an impermissible conflict between the interests of the general membership and Respondents' personal financial interests. While Respondents, as Executive Board members, were required to act solely on behalf of the membership when dealing with employers, Respondents' reliance on the service fees generated by the Program made them beholden to those employers with whom they negotiated. By callously abdicating their responsibilities in order to achieve personal economic gain, Respondents placed themselves in a position where their interests could be adverse to those of the general membership. Respondents thus crafted a scheme—the associate membership program—that allowed them to collect money for their personal economic benefit without regard to the deleterious effect such action might have on their representation of the general membership. The Independent Administrator's finding that the Investigations Officer had proven the Associate Membership Program Charge against Respondents is fully supported by the evidence.

## II. *The Loan Charge and the Audit Charge*

On November 10, 1988, Mr. Burke received his November salary from Local 917 in the amount of $4,309.55. On the same day, Mr. Burke received a second check in the amount of $4,309.55 as an "advance" on his December 1988 salary and allowance. In December, however, Mr. Burke was paid his full salary and allowance in spite of the earlier "advance." Local 917's books describe the December 1988 payment as an "advance" on Mr. Burke's January 1989 salary. This pattern was repeated, and the loan rolled over,

such that Mr. Burke remained indebted to Local 917 for the sum of $4,309.55—the equivalent of one month's salary and advance—until December 1989. This unsecured, interest-free indebtedness was not memorialized by a promissory note or loan agreement.

In February 1989, an IBT auditor, Mr. John Hartigan, questioned Local 917 about Mr. Burke's outstanding salary advance. Initially, Respondent Ottman informed the auditor that it was a "mistake" and that Mr. Burke had repaid the loan. Mr. Hartigan asked Mr. Ottman to verify this information. Thereafter, Mr. Ottman discovered that the loan remained outstanding and informed Mr. Hartigan and Mr. Burke of this fact. Mr. Burke claims that he repaid the advance the day after he was notified that it was outstanding. *See Respondents' Objections* at 18. The Independent Administrator did not credit this testimony, however, and found that this repayment was "illusory." *See Ind.Admin.Dec.* at 25.

On March 31, 1989, then General Secretary–Treasurer of the IBT, Weldon L. Mathis, wrote Mr. Burke to question whether the advance had been repaid. Mr. Burke forwarded this letter to Mr. Wolchok for response. Mr. Wolchok knew that Mr. Burke continued to owe money to Local 917 because the November 1988 loan had been "rolled over" from month to month. Nevertheless, Mr. Wolchok transmitted a letter, dated April 12, 1989, to the IBT stating that "this oversight was paid in full on February 13, 1989." *See Respondents' Objections* at 44.

With regard to the Loan Charge, the Independent Administrator found that the Investigations Officer had proven that Messrs. Burke and Wolchok violated 29 U.S.C. § 503(a) and breached their fiduciary duties to the Union. *See Ind.Admin.Dec.* at 23. Title 29, United States Code, Section 503(a) prohibits labor organizations from directly or indirectly making loans in excess of $2,000.00 to officers or employees of such organizations. Mr. Burke and Mr. Wolchok object to the Independent Administrator's determination, and have reiterated before this Court arguments raised in front of the Independent Administrator. Messrs. Burke and Wolchok

do not contest that Mr. Burke accepted salary advances from Local 917 in excess of $2,000.00, that Mr. Burke owed this sum to the Local from November 1988 through December 1989, or that both Mr. Burke and Mr. Wolchok signed the checks representing the salary advance. *See Ind.Admin.Dec.* at 19. Messrs. Burke and Wolchok, however, contend that the Independent Administrator's findings with regard to the Loan Charge are arbitrary and capricious because Mr. Burke and Mr. Wolchok did not realize that a salary advance constituted a loan, relied on the advice of counsel prior to engaging in the allegedly offensive conduct, and their violation, if any, was not willful. These objections are without merit.

█ It is clear that a salary advance constitutes a loan within the meaning of 29 U.S.C. § 503(a). As the Independent Administrator stated, Black's Law Dictionary defines a loan as:

> Delivery by one party to and receipt by another party of a sum of money, upon agreement, express or implied, to repay it with or without interest.

*Ind.Admin.Dec.* at 20 (quoting *Black's Law Dictionary* (6th Ed.1991)). The Independent Administrator found that "[h]ere, monies were delivered by the Local to Burke, who received and accepted the money, with, at a minimum, an implicit agreement to repay the Local." *Id.* at 20. The Independent Administrator therefore found that Mr. Burke had accepted a loan in excess of $2,000.00 from the Local. *See id.* This conclusion is clearly supported by the evidence.

█ Thus, the only questions that remain are whether Messrs. Burke and Wolchok are relieved of liability under 29 U.S.C. § 503(a) because they allegedly did not know they were violating a federal statute or because they allegedly sought and acted in accordance with the advice of counsel. First, Mr. Burke and Mr. Wolchok need not have known specifically of the terms of the prohibition contained in 29 U.S.C. § 503(a), because they are charged with knowledge of the statute. *See United States v. Scanio,* 900

F.2d 485, 489 (2d Cir.1990).[5] As the Independent Administrator correctly stated, "[t]he willfulness of Respondents' conduct lies not in whether they willfully violated the *statute*, but whether they willfully engaged in conduct that violated the statute." *Ind.Admin.Dec.* at 21. The record makes clear that Messrs. Burke and Wolchok willfully engaged in conduct that violated the statute. Therefore, the Independent Administrator's finding that Mr. Burke and Mr. Wolchok breached their fiduciary duties to the Union by willfully engaging in conduct that violated 29 U.S.C. § 503(a) is neither arbitrary or capricious.

■ Second, reliance on the advice of counsel does not negate the element of intent unless such reliance is reasonable. In order for reliance to be reasonable, Mr. Burke and Mr. Wolchok were required, at a minimum, to inform counsel of all information necessary for counsel to provide sound, informed advice. Nevertheless, Mr. Burke and Mr. Wolchok admit that they failed to inform counsel of the amount of the loan or of the past practices of the Local. *Respondents' Objections* at 44. Because Messrs. Burke and Wolchok failed to fully inform counsel of material facts necessary for counsel to assess the legality of the loan to Mr. Burke, they cannot escape liability by claiming reliance on the advice of counsel. *See United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir.1989), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). Therefore, the Independent Administrator's determination that the Investigations Officer had proven the Loan Charge against Mr. Burke and Mr. Wolchok is supported by the weight of the evidence.

■ Finally, the Independent Administrator found that Mr. Wolchok breached his fiduciary duty to the Union and brought reproach upon the IBT by misrepresenting to an IBT auditor the status of the salary advance that had been made to Mr. Burke. *See Ind.Admin.Dec.* at 24–25. Article X, Section 10, of the IBT Constitution authorizes the General Secretary–Treasurer of the IBT to audit the books of Local Unions. This Article makes interference with such an audit a basis for discipline under Article XIX. In February 1989, following an audit conducted pursuant to Article X of the IBT Constitution, Mr. Wolchok informed the General Secretary–Treasurer that Mr. Burke's advance was "paid in full" in spite of the fact that he knew that the advance had been rolled over from month to month. Accordingly, the Independent Administrator found that "the Investigations Officer has met his burden of just cause in proving that Respondent Wolchok willfully or intentionally sought to misrepresent the facts" concerning the loan to Mr. Burke. *Ind.Admin.Dec.* at 25. Respondents have submitted no new evidence to this Court that casts doubt on the Independent Administrator's findings. Indeed, Respondents are unable to refute that Mr. Wolchok intentionally misrepresented to the IBT the status of Mr. Burke's loan or that he knew such statements were false at the time that they were made. As such, the Independent Administrator's determination that the Investigations Officer had proven the Audit Charge is not arbitrary or capricious.

### III. *The Embezzlement Charge*

In or around November 15, 1989, Messrs. Burke and Wolchok, in their capacity as members of the Executive Board of Local 917, caused Local 917 to give Mr. Burke a salary increase of $6,019.00, retroactive to January 1, 1989. *See Minutes of the Local 917 Executive Board, November 15, 1989.* Respondents admit that this raise was designed so that "the amount equal[ed] the amount that [Burke] owed to the Local Union on the salary advance." *Respondents' Objections* at 20. Indeed, Mr. Burke performed no additional work for the retroactive payment, and had previously been fully compensated for the period that it covered.

■ The Investigations Officer alleged that the retroactive salary increase was unauthorized and fraudulent and thus violated 29 U.S.C. § 501(c) and IBT Constitution Ar-

---

**5.** Indeed, in light of Mr. Wolchok's and Mr. Burke's extensive experience, the Independent Administrator did not credit their testimony that they did not realize that the advance was a loan or their claim that they were unaware of the prohibition contained in 29 U.S.C. § 503(a).

ticle XIX, § 6(b)(3). Article XIX of the IBT Constitution prohibits the embezzlement or conversion of Union funds. Respondents assert that Mr. Burke and Mr. Wolchok revealed to the Executive Board of Local 917 that the purpose of the retroactive raise was to satisfy Mr. Burke's indebtedness to the Local. The Independent Administrator, however, did not find this claim credible and determined that Mr. Burke and Mr. Wolchok did not reveal this purpose to the Executive Board. Thus, the Independent Administrator found that the Investigations Officer had "proven by a fair preponderance of the evidence that Respondents Burke and Wolchok acted with the requisite fraudulent intent to deprive Local 917 of its funds." *Ind.Admin.Dec.* at 24.

Mr. Burke and Mr. Wolchok challenge the sufficiency of the evidence supporting the Independent Administrator's determination that they had not disclosed to the Executive Board of Local 917 the true purpose of the retroactive salary increase. However, such a determination is well within the province of the Independent Administrator: The Independent Administrator is best situated to assess the credibility of witnesses as well as the weight to be accorded evidence adduced at a hearing. *See United States v. IBT*, 978 F.2d 68, 74 (2d Cir.1992). After carefully reviewing the evidence before the Court, as well as the transcript of the hearing conducted by the Independent Administrator, this Court finds that the evidence strongly supports the Independent Administrator's decision that Messrs. Wolchok and Burke failed to inform the Executive Board of Local 917 as to the true purpose of the retroactive salary increase. Therefore, Messrs. Burke and Wolchok acted with fraudulent intent and the retroactive salary advance was prohibited by the IBT Constitution. *See* IBT Constitution Article XIX, § 6(b)(3); *see also* 29 U.S.C. § 501(c). The Independent Administrator's determination that the Investigations Officer had shown just cause to find that Messrs. Burke and Wolchok acted with the requisite fraudulent intent to deprive Local 917 of its funds, and had therefore proven the Embezzlement Charge, was not arbitrary or capricious.

## IV. *The Penalty*

Respondents contend that the penalty imposed by the Independent Administrator—a two year suspension from the IBT followed by a two-year ban on holding IBT affiliated positions such as Executive Board or Trustee positions—is arbitrary and capricious. Respondents argue that this penalty is "excessively severe," *see Respondents Objections* at 46, 48, and that the Independent Administrator failed to consider the individual Respondents' level of participation in the offenses charged. *Id.* at 48.

### a. The Penalties Imposed on Respondents Burke and Wolchok

Mr. Burke's and Mr. Wolchok's argument, to the extent that it is based on the severity of the sanctions imposed, is wholly without merit. The Independent Administrator carefully considered Mr. Burke's and Mr. Wolchok's participation in the charged offense as well as factors in mitigation of punishment. *See Ind.Admin.Dec.* at 26–29. Indeed, in imposing sanctions, the Independent Administrator specifically "acknowledge[d] the contributions that [Mr. Burke and Mr. Wolchok] have made to … both Local 917 and Local 868." *Id.* at 26. Mr. Burke's and Mr. Wolchok's belief that the sanctions imposed are "harsh" does not make the Independent Administrator's decision arbitrary or capricious. *See United States v. IBT*, 981 F.2d 1362, 1371 (2d Cir. 1992) (refusing to overturn Independent Administrator's decision, even though court itself may have imposed a less severe sanction). As the Second Circuit has stated, "[t]he experienced independent administrator—himself a former federal district judge—heard the witnesses and fixed a penalty. On this record there is no basis for finding the penalty chosen by the administrator was either arbitrary or capricious." *United States v. IBT*, 978 F.2d 68, 74 (2d Cir.1992). The Independent Administrator carefully considered the evidence presented. In light of the seriousness of Messrs. Burke's and Wolchok's wrongdoing and their patent disregard of their fiduciary duties, the penalty fixed by the Independent Administrator

was appropriate and was not arbitrary or capricious.

b. The Penalties Imposed on Respondents Mario Abrego, Robert Ottman, Langston McKay, Walter Cahill, Saul Brechner, and Walter Simmons

 A unique consideration is presented with regard to the penalties imposed by the Independent Administrator on Messrs. Abrego, Ottman, McKay, Cahill, Brechner, and Simmons. Both this Court and the Second Circuit have held that the Independent Administrator, who presides over disciplinary hearings pursuant to the Consent Decree, is best situated to determine and fix the penalty to be imposed upon IBT members who violate the Consent Decree's disciplinary provisions. *See United States v. IBT*, 978 F.2d at 73. In doing so, he is entitled to great deference. *See United States v. IBT*, 981 F.2d at 1368; *United States v. IBT*, 978 F.2d at 74. This is a matter of critical importance. The Independent Administrator, a former federal district judge, conducts the hearings and thus is best equipped to evaluate the demeanor, credibility and, ultimately, the culpability, of those who appear before him. *See id.;* Feb. 9, 1993 Opinion & Order, 814 F.Supp. 1165, 1185 (S.D.N.Y.1993). It follows that he is also uniquely situated to evaluate what weight to accord various aggravating and mitigating factors in a given case, and thus, to chose an appropriate penalty.

 An example of the Independent Administrator's great discretion in this area is found in *United States v. IBT ("Sansone")*, 981 F.2d 1362, 1370–72. In *Sansone*, the Second Circuit refused to overturn the Independent Administrator's decision to permanently bar the President of IBT Local 682, Robert S. Sansone, from holding Union office, even though the Court of Appeals indicated that it might have reached a different result. *See id.* at 1370–72. Mr. Sansone had argued that the penalty imposed was overly harsh—especially given that other IBT members had received more lenient penalties for arguably similar conduct. Nonetheless, the penalty imposed withstood scrutiny in this Court and the Second Circuit because, although the penalty *was* more severe than that which had been imposed on individuals found guilty of similar wrongdoing, the Independent Administrator, who observed the defendant's demeanor and was able to best assess the corpus of evidence presented, determined that "the punishment fit the crime." As the Second Circuit stated, "the apparent discrepancy between the penalty imposed here and those imposed in other cases does not inexorably compel the conclusion that the Independent Administrator acted arbitrarily or capriciously." *Id.* at 1372.

Thus, Respondents' claim that the penalties imposed in the instant matter are arbitrary and capricious because they are "severe" or "harsh" is unpersuasive. Yet, the instant matter deserves a second look. While other disciplined IBT members have challenged penalties based on an analysis of penalties imposed in unrelated matters, Respondents in this case have challenged their penalties in light of the conduct and penalties of individuals involved in the same matter. In other words, there exists a common baseline. While Mr. Sansone, for instance, cited penalties imposed in wholly unrelated matters, Messrs. Abrego, Ottman, McKay, Cahill, Brechner, and Simmons raise questions of proportionality in light of the penalties imposed on Mr. Burke and Mr. Wolchok. Not only is there such a common baseline here, but all Respondents enjoy similar mitigating factors. Thus, they ostensibly differ only in their degree of culpability. In light of the fact the Messrs. Abrego, Ottman, McKay, Cahill, Brechner, and Simmons appear to be less culpable than Mr. Burke and Mr. Wolchok, it is not clear why identical sanctions have been imposed on all Respondents. A group of respondents in the same matter, with similar mitigating circumstances but differing degrees of culpability, received the same penalty. In the absence of further explanation, this Court can only conclude that the sanctions imposed on Messrs. Abrego, Ottman, McKay, Cahill, Brechner, and Simmons are arbitrary and capricious.

On remand, the Independent Administrator may conclude that, in light of the seemingly greater wrongdoing perpetrated by Mr. Burke and Mr. Wolchok, Messrs. Abrego,

Ottman, McKay, Cahill, Brechner, and Simmons should be accorded a more lenient penalty. Alternatively, the Independent Administrator may conclude that, in light of the level of culpability of each of the Respondents and other mitigating evidence, a uniform penalty is warranted. On remand, the Independent Administrator shall reconsider the penalty to be imposed on Respondents Abrego, Ottman, McKay, Cahill, Brechner, and Simmons in light of this opinion.

## CONCLUSION

IT IS HEREBY ORDERED that John T. Burke's and Harold Wolchok's objections to the Independent Administrator's decision are DENIED; and

IT IS FURTHER ORDERED that Mario Abrego's, Robert Ottman's, Langston McKay's, Walter Cahill's, Saul Brechner's, and Walter Simmons' objections to the Independent Administrator's decision are DENIED except as to the penalty to be imposed on these respondents; and

IT IS FURTHER ORDERED that this case is remanded to the Independent Administrator to reconsider, in light of this opinion, the penalty to be imposed on Respondents Abrego, Ottman, McKay, Cahill, Brechner, and Simmons; and

IT IS FURTHER ORDERED that the decision of the Independent Administrator is otherwise AFFIRMED; and

IT IS FURTHER ORDERED that, effective immediately, the stay of penalties imposed by the Independent Administrator is dissolved in connection with the penalties imposed on Mr. Burke and Mr. Wolchok.

SO ORDERED.